**In re Maralyn A. BARNES, Debtor.**

No. 99–30869.

United States Bankruptcy Court,
E.D. Michigan,
Southern Division—Flint.

April 18, 2001.

Subsequent Opinion Regarding Debtor's
TIAA Account June 6, 2001.

Paul A. Pianto, Owosso, MI, for Debtor.

Collene K. Corcoran, Bingham Farms, MI, Chapter 7 Trustee.

***FINDINGS OF FACT, CONCLUSIONS OF LAW, AND OPINION REGARDING OBJECTION TO EXEMPTION IN DEBTOR'S TIAA AND CREF ACCOUNTS***

ARTHUR J. SPECTOR, Chief Judge.

This contested matter arose upon the filing of an objection by Colleen Corcoran, the chapter 7 trustee, to the Debtor's claim that her interest in certain annuity contracts was exempt. Pursuant to F.R.Civ.P. 52(a) (incorporated by

F.R.Bankr.P. 9014 and 7052), the Court now issues its Findings of Fact and Conclusions of Law. For the reasons set forth hereafter, the Court holds that only one of the two interests at issue constitutes property of the bankruptcy estate. The trustee's objection to the non-estate interest will therefore be dismissed as moot. With respect to the estate interest, a hearing will be set to determine the validity of the trustee's objection.

### Findings of Fact

(1) The Debtor is an employee of Michigan State University ("MSU").

(2) As such, she was required to enroll in MSU's "Base Retirement Plan" (the "Plan"). Exhibit 1 (a copy of the Plan).

(3) The Debtor participated in the Plan through the purchase of two annuity contracts, one issued by the Teachers Insurance and Annuity Association of America ("TIAA"), and the other issued by the College Retirement Equities Fund ("CREF"). Exhibits A ("Retirement Annuity Contract" (TIAA)) and B ("Retirement Unit–Annuity Certificate" (CREF)).

(4) The premiums for the annuity contracts are paid by MSU, with the cost thereof defrayed by a 5% reduction of the Debtor's salary. Exhibit 1 at p. 6.

(5) For purposes of this litigation, the Court assumes that the Plan and annuity contracts meet the requirements of 26 U.S.C. § 403(b)(1). Testimony of Sherry Smalley Van Kampen, C.E.B.S. (Ms. Van Kampen, who is employed as a Human Resource Analyst in the Benefits Retirement Office of MSU's Human Resources Department, described the benefit program in which the Debtor participates as a "403(b) Plan."); Exhibit 4 (CREF Prospectus), at p. 46 ("CREF certificates are tailored for retirement plans set up under section 403(b) of the [Internal Revenue

Code] . . . ."); Exhibit 5 (TIAA Real Estate Account Prospectus), at p. 50 ("The [annuity] contracts are tailored for retirement plans set up under section 403(b) of the . . . [Internal Revenue Code]."); Exhibit 1 at p. 6 ("Contributions are tax-deferred . . . and are *not* taxed as income in the year they are contributed, but are taxed as income in the year they are distributed."); 26 U.S.C. § 403(b)(1) (If an "annuity contract" meets the criteria set forth in this statute, "then amounts contributed by [the] . . . employer . . . shall be excluded from the gross income of the employee for the taxable year. . . . The amount actually distributed to any distributee under such contract shall be taxable to the distributee (in the year in which so distributed). . . .").

(6) Pursuant to the Plan, the Debtor may obtain annuity distributions only if one of the following circumstances applies: "[i] [a]ttainment of age 59½[;] [ii] disability[;] [iii] death; [iv] financial hardship, such as purchase of a principal residence; to avoid eviction from home; college tuition for self, spouse or dependent; funeral expenses; medical expenses[;] [v] loans. . . ." Exhibit 1 at p. 11. *See also* Exhibit C ("Changes Made to MSU's Base Retirement Plan") at p. 1; *compare* 26 U.S.C. § 403(b)(11) (Pursuant to this provision, § 403(b)—including the tax deferral on contributions for an "annuity contract" granted under § 403(b)(1)—is not applicable "unless under such contract distributions attributable to contributions made pursuant to a salary reduction agreement . . . may be paid only—(A) when the employee attains age 59½, separates from service, dies, or becomes disabled . . . , or (B) in the case of hardship.").

(7) Under the terms of the Plan, the amount which a participant may borrow

from TIAA/CREF [1] cannot exceed the lesser of (i) $50,000; (ii) 45% of combined TIAA and CREF accumulations; or (iii) 90% of CREF accumulations. Exhibit C at pp. 1 & 6; Testimony of Sherry Smalley Van Kampen, C.E.B.S. *Compare* 26 U.S.C. § 72(p)(1)(A) ("If during any taxable year a participant ... receives ... any amount as a loan from a qualified employer plan, such amount shall be treated as having been received by such individual as a distribution under such plan.") *with* 26 U.S.C. § 72(p)(2)(A)(i) (Section 72(p)(1)(A) generally does not apply to loans of $50,000 or less.). By these criteria, the Debtor was eligible to obtain a $50,000 loan. Testimony of Sherry Smalley Van Kampen, C.E.B.S.

(8) The Plan requires that a loan from TIAA/CREF "for [the] purchase of [a] primary residence" be repaid within 10 years. Exhibit C at p. 6. A loan for any other purpose must be repaid within 5 years. *See id. Compare* 26 U.S.C. § 72(p)(2)(B)(i) (Section 72(p)(2)(A) "shall not apply to any loan unless such loan, by its terms, is required to be repaid within 5 years.") *with* 26 U.S.C. § 72(p)(2)(B)(ii) (Section 72(p)(2)(B)(i) "shall not apply to any loan used to acquire any dwelling unit which within a reasonable time is to be used ... as the principal residence of the participant.").

(9) The Plan states that the "[a]mount of [any] default [in repayment of the loan] will be reported to [the] IRS as ordinary income." Exhibit C at p. 6. If the borrower is less than 59 and ½ years of age, the default may also be treated as an "early distribution." *Id.*

(10) Each annuity contract provides that its "validity and effect ... are governed by the laws" of the State of New York. Exhibits A and B at p. 3.

(11) The TIAA contract states that "[a]ny assignment, pledge, or transfer of ownership, by the Annuitant [i.e., the Debtor] ... of this contract or of any benefits hereunder will be void and of no effect." Exhibit A at ¶ 15. The contract provides further that "[t]he benefits, options, rights, and privileges accruing to the Annuitant ... will not be transferable or subject to surrender, commutation, or anticipation.... To the extent permitted by law, annuity and other benefit payments will not be subject to the claims of any creditor of the Annuitant ... or to execution or to legal process." *Id.* at ¶ 17.

(12) The CREF contract states that "[a]ny assignment, pledge, or transfer of ownership, by the Annuitant [2] ... of this certificate or of any benefits hereunder will be void and of no effect." Exhibit B at ¶ 15. The contract contains another provision which states: "Benefits under this certificate are protected by the following clause contained in the statute of the State of New York establishing CREF:

'No money or other benefit provided or rendered by the corporation hereby formed, nor any rights or interests of any participating person in any benefit provided by said corporation, ... shall be subject to assignment or pledge, or be liable to attachment, garnishment, or other process, or to be seized, taken, appropriated, or applied by any legal or equitable process or operation of law to pay any debt or liability of any such person....'"

*Id.* at ¶ 16 (quoting 1952 N.Y. Laws ch. 124, § 9).

---

**1.** TIAA and CREF are related organizations. *See* Exhibit 4 at p. 11, 414 N.Y.S.2d 632. It is not clear from the record which of the two entities would make the loan.

**2.** The Court assumes that the reference in this paragraph to the "Annuitant" is to the Debtor, though she is elsewhere described in the CREF contract as a "participant."

(13) The Debtor filed for chapter 7 bankruptcy relief on April 19, 1999.

(14) The Debtor claimed that her interest in the annuity contracts is fully exempt pursuant to 11 U.S.C. § 522(d)(10)(E). *See* Debtor's Schedule C.

(15) The trustee timely filed an objection to this claim of exemption. The objection is based on her contention that "not all of the funds in the retirement annuity are ·reasonably necessary for the [Debtor's] continued support." Brief in Support of Trustee's Objection at p. 2. *See* 11 U.S.C. § 522(d)(10)(E) (A debtor generally may exempt her "right to receive ... a payment under a stock ·bonus, pension, profitsharing, annuity, or similar plan or contract on account of illness, disability, death, age, or length of service, *to the extent reasonably necessary for the support of the debtor* and any dependent of the debtor." (emphasis added)).

(16) In response to the trustee's objection, the Debtor asserted that her interest in the annuity contracts is excluded from the bankruptcy estate by operation of 11 U.S.C. § 541(c)(2).

## Conclusions of Law

(1) Neither party arguing to the contrary, the Court assumes that the validity of the contracts is to be determined by New York law. *See, e.g., Richardson v. TIAA/CREF,* 123 B.R. 540, 542 (E.D.N.C. 1991) (giving effect to TIAA and CREF contract provisions calling for application of New York law); *In re Montgomery,* 104 B.R. 112, 115 (Bankr.N.D.Iowa 1989) (doing likewise, notwithstanding the parties' apparent assumption that Iowa law controlled); *see generally In re Portnoy,* 201 B.R. 685, 697 (Bankr.S.D.N.Y.1996) ("[F]ederal ... choice of law principles generally respect a designation in a trust which provides that a certain law be applied to interpret it.").

(2) For present purposes, the Court accepts as true the trustee's unchallenged assertion that the Plan is a "governmental plan" within the meaning of § 1002(32) of the Employee Retirement Income Security Act of 1974, 29 U.S.C. § 1001 *et seq.* ("ERISA"). *See* Trustee's Brief at p. 3 (citing a decision which collected cases holding that "public school districts are exempt from ERISA because they are government plans," *Missouri State Colleges & Universities Group Ins. Consortium v. Business Men's Assurance Co. of America,* 980 F.Supp. 1333, 1334 (W.D.Mo. 1997)); *cf. In re Lyons,* 148 B.R. 88, 93 n. 6 (Bankr.D.D.C.1992) (assuming, since the debtor did not argue otherwise, that the TIAA and CREF contracts "were not ERISA-qualified pensions"); *see generally* 29 U.S.C. § 1002(32) ("The term 'governmental plan' means a plan established or maintained for its employees by the ... government of any State or political subdivision thereof, or by any agency or instrumentality of any of the foregoing."); MICH. CONST. art. 8, § 5 ("[T]he trustees of Michigan State University and their successors in office shall constitute a body corporate known as the Board of Trustees of Michigan State University...."); *State of Michigan v. United States,* 40 F.3d 817, 823 (6th Cir.1994) (describing MSU as a "public universit[y]"). As such, the Plan is not subject to an ERISA requirement that "[e]ach pension plan ... provide that benefits provided under the plan may not be assigned or alienated." 29 U.S.C. § 1056(d)(1). *See* 29 U.S.C. § 1003(b)(1) ("The provisions of ... subchapter [I, which includes § 1056,] shall not apply to any employee benefit plan if ... such plan is a governmental plan....").

■ (3) The Debtor bore the burden of proving that the annuity contracts are excluded from the bankruptcy estate pursuant to § 541(c)(2). *In re Fulton,* 240 B.R.

854, 862 n. 4 (Bankr.W.D.Pa.1999); *In re Gilroy,* 235 B.R. 512, 515 (Bankr.D.Mass. 1999). (Counsel for the Debtor conceded this point during oral argument.)

(4) The Debtor met this burden with respect to the CREF contract, but not with respect to the TIAA contract. The Court's rationale for this holding is set forth in the section which follows.

## Opinion

The bankruptcy estate generally includes "all legal or equitable interests of the debtor in property as of the commencement of the case." 11 U.S.C. § 541(a)(1). Section 541(c)(2), however, provides that "[a] restriction on the transfer of a beneficial interest of the debtor in a trust that is enforceable under applicable nonbankruptcy law is enforceable in a case under this title." 11 U.S.C. § 541(c)(2).

■ An interest which falls within the scope of § 541(c)(2) does not become part of the bankruptcy estate. *See Patterson v. Shumate,* 504 U.S. 753, 755, 757, 112 S.Ct. 2242, 119 L.Ed.2d 519 (1992). Such an interest being non-estate property, there is no need for the debtor to claim it as exempt. *See, e.g., Fulton,* 240 B.R. at 860, 869–70. Thus before considering whether the Debtor's claimed exemption is proper, the Court addresses her contention that § 541(c)(2) renders that issue moot.

## A. Section 541(c)(2) Applies Only to Trust Interests

As indicated, § 541(c)(2) excludes certain "interest[s] of the debtor *in a trust.*" 11 U.S.C. § 541(c)(2) (emphasis added). Given the language of the statute, it should go without saying that a non-trust interest is outside the purview of § 541(c)(2). Nor does the Debtor contend that the provision applies to such an interest. There are, however, two lines of cases which at least arguably support that proposition.

The first group of cases involves pension plans that are "ERISA-qualified," meaning that the plan is subject to and complies with subchapter I of ERISA, including 29 U.S.C. § 1056(d)(1) (the antialienation provision quoted *supra* p. 420). *See generally In re Baker,* 114 F.3d 636, 638 (7th Cir. 1997) (suggesting that in this context, the term "ERISA-qualified" is best understood as referring to a plan which contains the § 1056(d)(1)-mandated antialienation provision). The most significant among them, for obvious reasons, is the Supreme Court's decision in *Shumate, supra.*

The issue in *Shumate* was whether § 541(c)(2)'s reference to "applicable nonbankruptcy law" was limited to state law, as many courts had held, or if it also encompassed federal law. *See Shumate,* 504 U.S. at 755, 757, 759, 112 S.Ct. 2242. The Court endorsed the latter, more expansive interpretation. *See id.* at 759, 112 S.Ct. 2242. It further ruled that "[t]he antialienation provision required [by § 1056(d)(1) ] ... and contained in the [debtor's pension] Plan ... constitutes an enforceable transfer restriction for purposes of § 541(c)(2)." *Id.* at 760, 112 S.Ct. 2242.

*Shumate's* holding is straightforward enough: ERISA can constitute a source of the "nonbankruptcy law" to which § 541(c)(2) refers. But in resolving that issue, the Court may have created a new one—namely, whether the statute applies to non-trust interests.

The confusion on this latter point is attributable in large part to what is *not* said in *Shumate.* Curiously absent from the Supreme Court's decision is any discussion of § 541(c)(2)'s trust requirement. And on occasion the Court seems unaware of the requirement. At the outset of the opinion, for example, § 541(c)(2) is described as "exclud[ing] from the bankruptcy estate property of the debtor that is

subject to a restriction on transfer enforceable under 'applicable nonbankruptcy law.'" *Id.* at 755, 112 S.Ct. 2242. No mention is made of the statute's limitation to trust interests. A less subtle example is the Court's puzzling assertion that § 541(c)(2) "entitles a debtor to exclude from property of the estate any interest *in a plan or trust* that contains a[n enforceable] transfer restriction." *Id.* at 758, 112 S.Ct. 2242 (emphasis added).

What is probably most significant, however, is the justification offered by the Court in support of its holding:

> We previously have declined to recognize any exceptions to ERISA's antialienation provision *outside* the bankruptcy context. See *Guidry v. Sheet Metal Workers Nat. Pension Fund,* 493 U.S. 365, 110 S.Ct. 680, 107 L.Ed.2d 782 ... (1990) (labor union may not impose constructive trust on pension benefits of union official who breached fiduciary duties and embezzled funds). Declining to recognize any exceptions to that provision *within* the bankruptcy context minimizes the possibility that creditors will engage in strategic manipulation of the bankruptcy laws in order to gain access to otherwise inaccessible funds. See Seiden, Chapter 7 Cases: Do ERISA and the Bankruptcy Code Conflict as to Whether a Debtor's Interest in or Rights Under a Qualified Plan Can be Used to Pay Claims?, 61 Am Bankr.LJ 301, 317 (1987) (noting inconsistency if "a creditor could not reach a debtor-participant's plan right or interest in a garnishment or other collection action outside of a bankruptcy case but indirectly could reach the plan right or interest by filing a petition ... to place the debtor in a bankruptcy involuntarily").
> Our holding also gives full and appropriate effect to ERISA's goal of protecting

pension benefits.... This Court has described that goal as one of ensuring that "if a worker has been promised a defined pension benefit upon retirement—and if he has fulfilled whatever conditions are required to obtain a vested benefit—he actually will receive it." ... In furtherance of these principles, we recently declined in Guidry, notwithstanding strong equitable considerations to the contrary, to recognize an implied exception to ERISA's antialienation provision that would have allowed a labor union to impose a constructive trust on the pension benefits of a corrupt union official. We explained:

> > "Section 206(d) [i.e., 29 U.S.C § 1056(d)] reflects a considered congressional policy choice, a decision to safeguard a stream of income for pensioners (and their dependents, who may be, and perhaps usually are, blameless), even if that decision prevents others from securing relief for the wrongs done them. If exceptions to this policy are to be made, it is for Congress to undertake that task."
> > ...

> These considerations apply with equal, if not greater, force in the present context. Finally, our holding furthers another important policy underlying ERISA: uniform national treatment of pension benefits.... Construing 'applicable nonbankruptcy law' to include federal law ensures that the security of a debtor's pension benefits will be governed by ERISA, not left to the vagaries of state spendthrift trust law.

*Id.* at 764–65, 112 S.Ct. 2242 (citations omitted).

The foregoing comments, stressing as they do the importance of according "full" protection to ERISA benefits, suggest that a debtor's interest in *any* ERISA-qualified plan is excluded from the bankruptcy es-

tate, regardless of whether the plan is structured as a trust. Indeed, the Fourth Circuit said as much in the very case that the Supreme Court affirmed:

> [A]ll ERISA-qualified plans, which by definition have a non-alienation provision, constitute 'applicable nonbankruptcy law' and contain enforceable restrictions on the transfer of pension interests.... That conclusion rests not on the reality of the particular beneficiary-settlor-trust relationship in issue, but instead on the status of the plan as ERISA-qualified.... [W]e see no reason to restrict § 541(c)(2)'s exclusion provision to spendthrift trusts. Instead, ... we ... give full effect to both ERISA and the Bankruptcy Code by holding that interests in ERISA-qualified pension plans are excluded from a bankrupt's estate.

*Shumate v. Patterson*, 943 F.2d 362, 364–65 (4th Cir.1991), *aff'd*, 504 U.S. 753, 112 S.Ct. 2242, 119 L.Ed.2d 519 (1992).

In light of the foregoing considerations, it is not surprising that some courts seem to have, in effect, construed the Supreme Court's *Shumate* decision as dispensing with § 541(c)(2)'s trust requirement. The Ninth Circuit, for example, declared that "[u]nder *Shumate*, a court need look no further than whether the ERISA-qualified plan at issue has an anti-alienation provision that satisfies the literal terms of § 541(c)(2)." *In re Rueter*, 11 F.3d 850, 852 (9th Cir.1993). The court explained: "Both the plan in *Shumate* and the one at issue here are ERISA-qualified plans that are subject to a statutory anti-alienation provision. Thus, the Plan at issue here meets the requirement laid down by ... *Shumate* for exclusion under § 541(c)(2)." *Id. See also id.* at 852 n. 1 ("[U]nder *Shumate*, creditors cannot reach ERISA-qualified pension plans."); *Manufacturers Bank & Trust Co. v. Holst*, 197 B.R. 856,

859 (N.D.Iowa 1996) ("After [*Shumate*] ..., it is no longer necessary to determine whether an ERISA-qualified plan is a spendthrift trust.... Once the plan is determined to be ERISA-qualified, the inquiry is finished." (quoting *In re Baker*, 195 B.R. 386, 390–91 (Bankr.N.D.Ill.1996), *aff'd*, (N.D.Ill.) (unpublished), *aff'd*, 114 F.3d 636 (7th Cir.1997))); *In re Nolen*, 175 B.R. 214, 217–19 (Bankr.N.D.Ohio 1994). Similar reasoning is seen in a case which, like the one at bar, involved TIAA and CREF annuities. *See In re Bennett*, 185 B.R. 4, 6–7 (Bankr.E.D.N.Y.1995).

Another decision binding on this Court which warrants discussion is *In re Lucas*, 924 F.2d 597 (6th Cir.1991). Anticipating *Shumate*, the Sixth Circuit held in *Lucas* that ERISA was "nonbankruptcy law" within the meaning of § 541(c)(2), and that ERISA-qualified plans are excluded from the estate pursuant to that provision. *See id.* at 600–03. Also like *Shumate*, *Lucas* stresses the importance of giving effect to ERISA, *see id.* at 602–03, and contains essentially no discussion of § 541(c)(2)'s trust requirement. Moreover, the court favorably cites *In re Threewitt*, 24 B.R. 927 (D.Kan.1982). *See Lucas*, 924 F.2d at 600–01, 603. This is noteworthy because that court came close to explicitly rejecting the trust requirement:

> [T]he relevant question is not whether the [pension] Plan looks like a good, old-fashioned spendthrift trust; the relevant question is whether Mr. Threewitt's interest in the Plan would be protected from creditors in an ordinary state court action in which nonbankruptcy law would apply. Under the plain and simple language of Section 541(c)(2), if the ERISA anti-alienation provisions are enforceable against general creditors, they are enforceable against the bankruptcy trustee.... [G]eneral creditors [can] not reach a debtor's interest in an

ERISA pension fund.... It accordingly follows, by virtue of Section 541(c)(2), that the bankruptcy trustee may not reach Mr. Threewitt's interest in the Plan.

*Threewitt,* 24 B.R. at 929. Thus the citation to *Threewitt* suggests that *Lucas* endorsed the proposition that an ERISA-qualified plan need not constitute a trust to fall within the reach of § 541(c)(2).

It must be emphasized, however, that neither *Shumate* nor *Lucas* explicitly addressed the question of whether § 541(c)(2) encompasses non-trusts. In fact, there is no indication in either case that a dispute existed concerning whether the debtor held a trust interest. And there are hints in *Shumate* that the Supreme Court assumed it was dealing with a trust.[3] *See Shumate,* 504 U.S. at 759, 112 S.Ct. 2242 (ERISA "clearly imposes a 'restriction on the transfer' of a debtor's 'beneficial interest' in the trust. The coordinate section of the Internal Revenue Code ... states as a general rule that '[a] trust shall not constitute a qualified trust ... unless the plan of which such trust is a part provides that benefits provided under the plan may not be assigned or alienated,' and thus contains similar restrictions." (citation omitted)). Since neither *Shumate* nor *Lucas* purported to address a *non-trust* interest in an ERISA-qualified plan, neither can be said to mandate the exclusion from the bankruptcy estate of such an interest. *Cf. In re Leadbetter,* No. 91–3076, 1993 WL 141068, at *2 (6th Cir. Apr. 30, 1993) (unpublished; per curiam) (stating that the asset at issue in *Shumate* was "the debtor's beneficial interest in a trust, the ERISA plan"); *id.* at *4 (indicating that *Shumate* was distinguishable because it involved a trust interest).

Even if either of these cases is construed as eliminating the trust requirement, the underlying rationale obviously could not be based on the view that § 541(c)(2) does not impose such a require-

---

3. This assumption—which may underlie many ERISA cases—would probably have been justified. In addition to the antialienation provision required by § 1056(d)(1), subchapter I of ERISA imposes various other requirements. One is that the plan "be established and maintained pursuant to a written instrument." 29 U.S.C. § 1102(a)(1). This instrument must "provide for one or more named fiduciaries who jointly or severally shall have authority to control and manage the operation and administration of the plan." *Id.* The plan must "provide a procedure for establishing and carrying out a funding policy and method consistent with the objectives of the plan and the requirements of ... subchapter [1], ... and specify the basis on which payments are made to and from the plan." 29 U.S.C. § 1102(b)(1), (4). And subchapter I clearly contemplates that, with limited exceptions, the plan is to be set up as a trust. *See* 29 U.S.C. § 1103(a) (This provision generally requires that "all assets of an employee benefit plan ... be held in trust."); 29 U.S.C. § 1104(a)(1)(A) ("[A] fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and ... for the exclusive purpose of: (i) providing benefits to participants and their beneficiaries; and (ii) defraying reasonable expenses of administering the plan."); 29 U.S.C. § 1103(c)(1) (providing generally that "the assets of a plan shall never inure to the benefit of any employer and shall be held for the exclusive purposes of providing benefits to participants in the plan and their beneficiaries and defraying reasonable expenses of administering the plan"). In light of these provisions, it would appear that as a general rule, ERISA-qualified plans *are* trusts for § 541(c)(2) purposes. *See In re Leadbetter,* No. 91–3076, 1993 WL 141068, at *4 (6th Cir. Apr. 30, 1993) (unpublished; per curiam) (asserting that the plan at issue in *Patterson v. Shumate,* 504 U.S. 753, 112 S.Ct. 2242, 119 L.Ed.2d 519 (1992) was a trust, and citing in support 29 U.S.C. § 1103(a)); *id.* at *3 (parenthetically summarizing a cited authority as "noting [the] distinction between ERISA plans, *which are trusts,* and § 457 deferred compensation plans, which cannot be trusts)" (emphasis added); *see generally infra* p. 21 (discussing the meaning of the term "trust" as used in § 541(c)(2)).

ment: The plain wording of the statute precludes any such interpretation. Rather, the only plausible justification for this construction would be that § 541(c)(2)'s trust requirement is not a sufficiently clear expression by Congress of an intention to carve out an exception to the protection from alienation afforded by ERISA (which was enacted several years prior to § 541(c)(2)). *Cf. Shumate,* 943 F.2d at 365 (indicating that the court's conclusion that § 541(c)(2) is not "restrict[ed] ... to spendthrift trusts" was based on the need to harmonize that statute with ERISA § 1056(d)(1)); *see generally, e.g., Astoria Fed. Sav. & Loan Ass'n v. Solimino,* 501 U.S. 104, 109, 111 S.Ct. 2166, 115 L.Ed.2d 96 (1991) ("[L]egislative repeals by implication will not be recognized, insofar as two statutes are capable of coexistence, 'absent a clearly expressed congressional intention to the contrary.'" (citation omitted)). Rather than "categorically" eliminating § 541(c)(2)'s trust requirement, then, the most that one can plausibly infer from *Shumate* or *Lucas* is that the requirement is not applicable to ERISA-qualified plans.

A post-*Shumate* decision of the Sixth Circuit underscores this point. In *Leadbetter, supra,* the court was called upon to decide whether § 541(c)(2) excluded from the bankruptcy estate the debtor's interest in a state-administered "public deferred compensation plan meeting the requirements of 26 U.S.C. § 457." *Leadbetter,* 1993 WL 141068 at *2. The Sixth Circuit had previously ruled that the interest was not excluded, but "[t]he Supreme Court ... vacated [that] ... opinion for reconsideration in light of its decision in" *Shumate. Id.* at *1. Notwithstanding *Shumate,* however, the court again held that § 541(c)(2) did not apply:

> By its own terms, a predicate to the application of § 541(c)(2) is that the property interest sought to be excluded

be "a beneficial interest ... in a trust." 11 U.S.C. § 541(c)(2).... Here, [26 U.S.C.] § 457(a)(6) ... provides that the deferred compensation remains the property of the employer, subject only to general creditor claims. By definition, a trust exists only when one party, the trustee, holds legal title to the corpus, while another party, the beneficiary, holds equitable or beneficial title in the corpus. See George T. Bogert, Trusts § 1 (6th ed.1987) (discussing nature of trusts and the division of legal and beneficial title between a trustee and a beneficiary.) See generally Black's Law Dictionary 156, 1508–09 (6th ed.1990) (defining trusts and explaining the division of legal and equitable title of the trust res). Thus, under § 457, the Ohio Program cannot be a trust because there is no division of title; rather, all the funds are the sole property of the Ohio Program.

. . .

Because the unambiguous language of § 541(c)(2) requires that the Ohio Program be a trust and the Ohio Program cannot be one, the § 541(c)(2) exception is inapplicable.... Thus, [the] debtor's deferred compensation in the Ohio Program remains part of the bankruptcy estate under § 541(a)(1).

*Id.* at *3–*4.

Since the decision was not published, *Leadbetter* has no precedential force. *See* 6 Cir. R. 206(c) ("Reported panel opinions are binding on subsequent panels. Thus, no subsequent panel overrules a published opinion of a previous panel. Court en banc consideration is required to overrule a published opinion of the court."). However, even "unpublished opinions ... often ... carry persuasive weight." *United States v. Webber,* 208 F.3d 545, 551 n. 3 (6th Cir.), *cert. denied,* 531 U.S. 882, 121

S.Ct. 197, 148 L.Ed.2d 137 (2000). *See also, e.g., Pertuso v. Ford Motor Credit Co.,* 233 F.3d 417, 422–23 (6th Cir.2000) (citing for support and expressly following an unpublished Sixth Circuit decision). *Leadbetter* is worthy of attention for several reasons.

First, as indicated *supra* p. 424, it counsels against construing *Shumate* (and, by logical extension, *Lucas*) as doing away with § 541(c)(2)'s trust requirement. Second, *Leadbetter* certainly supports the view that, at least with respect to non-ERISA-qualified interests, § 541(c)(2)'s trust requirement is alive and well. *Compare Nolen,* 175 B.R. at 218–19 (distinguishing *Leadbetter* on the ground that "[t]he plan before the court in that case was not ... ERISA qualified").

This latter observation is important here, of course, because MSU's Plan is not subject to ERISA § 1056(d)(1). *See supra* pp. 420–21. Whether *Shumate* or *Lucas* held, in effect, that this statute controls over § 541(c)(2) is therefore not relevant.

There is, however, a second group of cases which suggests that the trust requirement imposed by § 541(c)(2) is inapplicable—or "relaxed"—even with respect to a non-ERISA-qualified benefit plan. The Seventh Circuit, for example, seems to have embraced this viewpoint in a case which, like this one, involved annuity contracts issued by TIAA and CREF. *See Morter v. Farm Credit Servs.,* 937 F.2d 354 (7th Cir.1991). Because *Morter's* reasoning is rather diffuse, this Court quotes from the opinion at length:

> The [district] court determined that Congress intended to exclude from bankruptcy estates only "traditional"— i.e., donative—spendthrift trusts under applicable nonbankruptcy law.... Characterizing a retirement plan as a spendthrift trust is simply another way

of stating the conclusion that it must be excluded from the bankruptcy estate. A spendthrift trust is one "created to provide a fund for the maintenance of a beneficiary and at the same time to secure the fund against his improvidence or incapacity." *Black's Law Dictionary* 1400 (6th ed.1990). The classic example of such an arrangement is the trust a parent might set up for an irresponsible child who might fritter away the funds before reaching majority. *Of critical importance, then, is whether a fund has access restrictions similar to those of a spendthrift trust,* which "place the fund beyond the reach of the beneficiary's creditors, as well as ... secure the fund against the beneficiary's own improvidence." *Matter of Goff,* 706 F.2d 574, 580 (5th Cir.1983).

> [The debtor] ... believes that the district court[, which ruled that the TIAA contract did not create a trust,] overemphasized the importance of the fact that TIAA someday might have to reach into its own funds [to honor its annuity-payment obligation]. In this appeal, both [the Debtor] ... and *amicus curiae* TIAA–CREF argue that, in reviewing pension plans to determine whether they are included or excluded from the bankruptcy estate, courts properly should focus on whether the *debtor* has access to the funds. [emphasis in original] *If, as here, the debtor's access is restricted by a ban on receiving any of the funds until retirement, a prohibition against lump sum distributions, and restrictions on alienation, the pension plan should be excluded from the bankruptcy estate.*

Courts are split on the standards for determining whether a given set of restrictions on transfer and debtor access are sufficient to warrant the exclusion of retirement or pension plan from a bank-

ruptcy estate under 11 U.S.C. § 541(c)(2). Some have held that the plan must constitute a traditional spendthrift trust under applicable state law. *See, e.g., In re Swanson,* 873 F.2d 1121, 1123 (8th Cir.1989); *In re Lichstrahl,* 750 F.2d 1488, 1490 (11th Cir.1985); *Goff,* 706 F.2d at 587. *Cf. In re Nadler,* 122 B.R. 162, 166 (Bankr.D.Mass.1990) (section 541(c)(2) applies only "to the type of trust that traditionally has contained restrictions on assignments and not to trusts involving employee benefits"). Other courts have held that the plan need only exhibit the characteristics of a spendthrift trust under state law to be excluded. *See, e.g., McLean v. Central States, Southeast and Southwest Areas Pension Fund,* 762 F.2d 1204, 1207 n. 1 (4th Cir.1985) ("[N]owhere in [§ 541(c)(2) ] is there a requirement that the trust be 'traditional,' nor is there any definition of what might be found to constitute a 'traditional' trust."); *In re Atallah,* 95 B.R. 910, 919 (Bankr.E.D.Pa. 1989) ("Section 541(c)(2) is not limited to traditional spendthrift trusts, but also applies to pension funds which exhibit the characteristics of a spendthrift trust."); *In re Watkins,* 95 B.R. 483, 488 (W.D.Mich.1988) (pension plan is enforceable under Michigan law as a spendthrift trust because it prohibits alienation of interest); *In re Hysick,* 90 B.R. 770, 775 (Bankr.E.D.Pa.1988) (court must look at "a variety of factors"); *In re Pettit,* 61 B.R. 341, 346 (Bankr.W.D.Wash.1986) ("The degree of control that the debtor may exercise over the trust assets is a crucial factor in determining the issue of inclusion in, or exclusion from, the bankruptcy estate."); ... *Threewitt,* 24 B.R. ... [at] 929 ... ("relevant question is not whether the Plan looks like a good, old fashioned spendthrift trust") ....

The collective wisdom of this second group of cases is persuasive: the plain language of section 541(c)(2) does not require that a retirement plan be a "traditional" spendthrift trust. We agree with the Fourth Circuit's reasoning in *McLean* that *section 541(c)(2)*

> should [not] be confined in its recognition of enforceable transfer restrictions to those found in "traditional" spendthrift trusts. The language of § 541(c)(2) does not suggest such a limitation, and the legislative history reveals only that the provision has the unambiguous purpose of preserving enforceable transfer restrictions in spendthrift trusts....

762 F.2d at 1207 n. 1. *Even in cases in which courts have included retirement plans within the bankruptcy estate, there has been a willingness to exclude the plan if it is employer-created and controlled and, therefore, analogous to a spendthrift trust. See, e.g., Swanson,* 873 F.2d at 1124 (court indicated that the law creating a teacher retirement fund included language similar to that found in spendthrift trusts, but because the debtor-teacher contributed to the fund, the retirement plan was self-settled and would not qualify as a spendthrift trust under Minnesota law); *Goff,* 706 F.2d at 589 *(employer-created and controlled retirement plans may be characterized as "spendthrift trusts" for purposes of 11 U.S.C. § 541(c)(2) even though they are not traditional spendthrift trusts).*

...

*The proper inquiry under section 541(c)(2), then, is not whether the accumulated funds are in a "traditional" spendthrift trust, but whether the retirement plan bars the beneficiary and his creditors from reaching the funds. If it does, the plan is tantamount to a spend-*

*thrift trust under state law.* When we look at a retirement plan to determine whether it is a spendthrift trust, the fact that the plan administrators might have to dip into the fund to make up any shortfall [vis-à-vis annuity-payment obligations] is not as important to the analysis as the extent of access to the plan and who has that access.

[The debtor's] ... retirement plan ... is not "self-settled".... In establishing the plan and in contributing the entire cost of [the debtor's] ... participation, Purdue University intended to provide for the maintenance and support of [the debtor] ... and his dependents during his retirement, while at the same time protecting him against his own improvidence with regard to the use of the plan funds prior to that time. Consequently, the plan was set up so that [the debtor] ... would not have any control over the accumulation of its assets until retirement, and then only as set forth in the plan.

The plan provides that, upon retirement, [the debtor] ... will receive monthly payments from his TIAA plan; he will not receive a lump-sum distribution of the assets. Although [the debtor] ... can opt to receive a ten percent distribution on retirement, he does not have access to the other ninety percent that will generate income to be paid out over time. The fact that ninety percent of the fund is distributed in the form of periodic payments demonstrates that the fund was structured to insure the preservation of the corpus. To our mind, this scheme bears all the earmarks of a spendthrift trust.

*Id.* at 356–58 (emphasis added, except where otherwise noted). *See also id.* at 358 ("[P]ension plans that bar a beneficiary's access 'create a situation analogous to a spendthrift trust ... [that] must be enforced according to their spirit.' " (quoting *In re Guardianship of Dugan,* 29 Misc.2d 980, 222 N.Y.S.2d 831, 833 (N.Y.Sur.Ct. 1961); bracketed term added by *Morter*)).

Judging from the text which this Court has highlighted, *Morter* appears to stand for the proposition that an employee benefit plan need not be a trust at all: So long as the plan has an enforceable transfer restriction and is designed to function in a manner "analogous" to a spendthrift trust, the debtor's interest therein will be excluded from the bankruptcy estate pursuant to § 541(c)(2). *See In re VanMeter,* 137 B.R. 908, 911 (Bankr.N.D.Ind.1992) ("... *Morter* is clear that § 541(c)(2) demands an access test, ... without requiring rigid adherence to the technical requirements of state spendthrift trust law.").

This Court rejects that proposition. There is no statutory support for the notion that in determining whether a trust was created, employee benefit plans are subject to a less stringent standard than are other assets in which the debtor holds an interest. Since § 541(c)(2) makes no distinction along these lines, neither should the courts.[4] *See Securities Indus. Ass'n v. Board of Governors of the Fed. Reserve Sys.,* 468 U.S. 137, 153, 104 S.Ct. 2979, 82 L.Ed.2d 107 (1984) ("Had Congress intended so fundamental a distinction, it would have expressed that intent clearly in the statutory language or the legislative history. It did not do so, however, and it

---

**4.** Even if *Morter's* mode of analysis *would* apply to any asset, and not just employee benefit plans, the decision is unpersuasive. Section 541(c)(2) applies only to express trusts, and no such trust is created unless the putative trustee is contractually obligated to apply the funds in question for the debtor's benefit. *See infra* p. 26. *Morter* and the other cases cited either disregarded this basic trust characteristic or assumed without discussion that it was present.

is not this Court's function 'to sit as a super-legislature,' ... and create statutory distinctions where none were intended." (citations omitted)).

■ The foregoing cases notwithstanding, then, the Court concludes that, at least in the "non-ERISA" context, § 541(c)(2) applies only to trust interests. *See, e.g., In re Wilcox,* 233 F.3d 899, 904 (6th Cir.2000) (indicating that the first step in the three-part "inquiry under § 541(c)(2) ... [is the determination as to whether] the debtor ha[s] a beneficial interest in a trust"); *In re Yuhas,* 104 F.3d 612, 614 (3d Cir.1997); *see also Leadbetter,* 1993 WL 141068 at *3–*4 (quoted *supra* p. 425); *Booth v. Vaughan (In re Booth),* 260 B.R. 281, 290–91 (6th Cir. BAP 2001) ("Although the collective bargaining agreement in this case does contain a restriction against transfer, the Debtor has not shown the existence of either an express trust or a constructive trust." Accordingly, and following *Wilcox,* the court held that § 541(c)(2) did not apply.)

### B. The Parties' Stipulation is not Binding

■ The next question is whether the Debtor's rights under the annuity contracts constitute an interest in a "trust" within the meaning of § 541(c)(2). Not surprisingly, the Debtor asserted that she does indeed hold interests in "trusts." Less predictably, the trustee indicated at the hearing that she did not take issue with that assertion. *See also* Trustee's Brief at p. 3 ("The Trustee does not dis-pute that the debtor's interest in the plan is a trust....").

The Court, however, is free to reach its own conclusion on the legal issue of whether a trust was created. *See In re Young,* 91 F.3d 1367, 1373 (10th Cir.1996) ("[A] finding regarding the existence of a fiduciary duty is a legal, rather than a factual, finding."); *see generally Estate of Charles Henry Sanford v. Commissioner,* 308 U.S. 39, 51, 60 S.Ct. 51, 84 L.Ed. 20 (1939) ("We are not bound to accept, as controlling, stipulations as to questions of law."); *Swift & Co. v. Hocking Valley Ry.,* 243 U.S. 281, 289, 37 S.Ct. 287, 61 L.Ed. 722 (1917) (A "stipulation ... concerning the legal effect of admitted facts ... is obviously inoperative; since the court cannot be controlled by agreement of counsel on a subsidiary question of law."). *But see In re Colsden,* 105 B.R. 500, 502 (N.D.Iowa 1988) (treating the parties' "stipulat[ion] that the [profit-sharing] plan was a spendthrift trust" as a stipulation of fact, rather than of law); *see generally FDIC v. St. Paul Fire & Marine Ins. Co.,* 942 F.2d 1032, 1038 n. 3 and accompanying text (6th Cir. 1991) (indicating that a court is bound to accept a stipulation of fact unless the so-called fact is "patently untrue"). And for the reasons which follow, the Court concludes that only the CREF account constitutes a trust.[5]

### C. Section 541(c)(2) Applies Only to Express Trusts

■ The Code does not contain a definition of the term "trust." But its traditional and common meaning is neither con-

---

5. On March 2, 2001, the Court entered an Order for Further Briefing and/or for Reopening of Proofs. In the order, the Court alerted the parties to the possibility that the trust stipulation might be rejected. We, therefore, invited the Debtor "to submit proofs to establish that the contracts created a trust." Moreover, the order stated that if the Debtor did not offer additional proofs, "then the parties may submit supplemental briefs until March 30, 2001, on the question of whether the Debtor's TIAA and CREF accounts are 'trusts' for purposes of 11 U.S.C. § 541(c)(2)." The Debtor did not avail herself of the opportunity to supplement the proofs, and neither party submitted a supplemental brief.

troversial nor mysterious: A "trust ... is a fiduciary relationship with respect to property, subjecting the person by whom the title to the property is held to equitable duties to deal with the property for the benefit of another person, *which arises as a result of a manifestation of an intention to create it.*" RESTATEMENT (SECOND) OF TRUSTS § 2 (emphasis added). *See also* BLACK's LAW DICTIONARY (7th ed.1999) (providing a definition of "trust" which tracks the Restatement almost verbatim). Thus a defining characteristic of this form of trust, which the Court will identify as an "express" trust, is that it reflects the donor's actual intent (even if that intent is only implicitly expressed), and is not a legal fiction. *See generally id.* (An "express trust [is a] ... trust created with the settlor's express intent[.] ... [It is] an ordinary trust...."); RESTATEMENT (SECOND) OF TRUSTS § 1, Comment 'e' ("An express trust is created only if the settlor manifests an intention to create it."); 89 C.J.S. *Trusts* § 11 (1955) ("Express trusts are those which are created by the direct and positive acts of the parties, by some writing, or deed, or will, or by words either expressly or impliedly evincing an intention to create a trust." (footnote omitted)). Because they are non-consensual in nature, constructive trusts are not express trusts.[6] *See* RESTATEMENT (SECOND) OF

TRUSTS § 1, Comment e ("[A] constructive trust is imposed, not to effectuate intention, but to redress wrong or unjust enrichment. A constructive trust is remedial in nature."); BLACK's LAW DICTIONARY (7th ed.1999) (A "constructive trust [is a] ... trust imposed by a court on equitable grounds against one who has obtained property by wrongdoing, thereby preventing the wrongful holder from being unjustly enriched.").

There is nothing in the text of § 541(c)(2) which suggests that Congress meant the term "trust" to carry some meaning other than that of an express trust. To the contrary, § 541(c)(2)'s reference to transfer restrictions is itself an indication that the statute's drafters had express trusts in mind.

The legislative history reinforces the inference that § 541(c)(2) pertains solely to express trusts. It advises that the statute "continues over the exclusion from property of the estate of the debtor's interest in a *spendthrift trust* to the extent the trust is protected from creditors under applicable State law." H.Rep. No. 95–595, 95th Cong., 1st Sess. 176 (1977), U.S.Code Cong. & Admin.News 1978 pp. 5963, 6136 (emphasis added). The adjective "spendthrift," of course, is one which is used almost exclusively with reference to *ex-*

---

**6.** For the same reason, a trust relationship which is imposed by statute is not necessarily an "express" trust. *See In re Heilman,* 241 B.R. 137, 162 (Bankr.D.Md.1999) ("Statutory trusts are not express ... trusts. Trusts created by statute are ... created in law, regardless of the intentions of the parties. A statute alone cannot, in the absence of the parties' expressed intention, create an express ... trust."). At least in the context of § 523(a)(4), however, there is authority to the contrary. *See In re Bennett,* 989 F.2d 779, 784–85, *amended,* No. 91–1059, 1993 WL 268299 (5th Cir. July 15, 1993) ("Most courts today ... recognize that [§ 523(a)(4)'s] ... 'express' trust requirement is not limited to trusts that

arise by virtue of a formal trust agreement, but includes relationships in which trust-type obligations are imposed pursuant to statute or common law ."). *See also In re Interstate Agency, Inc.,* 760 F.2d 121, 124 (6th Cir.1985) (holding that a statutorily-imposed fiduciary obligation created "an express trust fiduciary relationship" for purposes of § 523(a)(4)); *In re Johnson,* 691 F.2d 249, 252 (6th Cir.1982) ("The Michigan Building Contract Fund Act[, which] imposes a 'trust' upon the building contract fund paid ... to a contractor[,] ... satisfies the express ... trust requirements of [former] section 17(a)(4)[, the pre-Code analogue to § 523(a)(4)].").

*press* trusts. *See generally* BLACK'S LAW DICTIONARY (7th ed.1999) (defining "spendthrift trust" as "[a] trust that prohibits the beneficiary's interest from being assigned and also prevents a creditor from attaching that interest").

Also noteworthy is the stated rationale for § 541(c)(2). A value judgment underlying this provision is that "[t]he bankruptcy of the beneficiary should not be permitted to defeat the legitimate expectations of the *settlor* of the trust." H.Rep. No. 95–595, 95th Cong., 1st Sess. 176 (1977), U.S.Code Cong. & Admin.News 1978 pp. 5963, 6136 (emphasis added). Again, the highlighted term is one that would not ordinarily be used in connection with a constructive trust. *See generally* RESTATEMENT (SECOND) OF TRUSTS § 3(1) ("The person who creates a trust is the settlor."); BLACK'S LAW DICTIONARY (7th ed.1999) ("A "settlor" is [a] person who makes a settlement of property; esp[ecially], one who sets up a trust.").

■ "[T]he words of a [federal] statute [are to be given] their 'ordinary, contemporary, common meaning,' absent an indication Congress intended them to bear some different import." *Williams v. Taylor*, 529 U.S. 420, 120 S.Ct. 1479, 146 L.Ed.2d 435, 448 (2000) (citations and internal quotation marks deleted). The ordinary meaning of the term "trust" does not include legal fictions created by courts or the legislature as a means of preventing or correcting an undesirable outcome. Rather, a "trust" is ordinarily understood to mean an express trust. There being no indication that the term carries an "extraordinary" meaning as used in § 541(c)(2), the natural conclusion is that this provision encompasses only express trusts. *See Leadbetter*, 1993 WL 141068 at *3 (implicitly assuming that a financial arrangement must meet conventional trust requirements to satisfy § 541(c)(2)); *Morter v. Farm Credit Servs.*, 110 B.R. 390, 395 (N.D.Ind.1990), *aff'd in part and rev'd in part*, 937 F.2d 354 (7th Cir.1991) (indicating that the issue under § 541(c)(2) is whether "the formation of a trust was the object of the parties' agreement"); *In re Pauley & McDonald, Inc.*, 215 B.R. 37, 41 (Bankr. D.Ariz.1996) (suggesting that § 541(c)(2) applies only to "[c]ertain express trusts"); *In re Kazi*, 125 B.R. 981, 986 (Bankr. S.D.Ill.1991), *aff'd on other grounds*, No. 91–00169, 1992 WL 611260 (S.D.Ill.1992), *aff'd*, 985 F.2d 318 (7th Cir.1993) ("[T]he Congressional intent behind Section 541(c)(2) of the Bankruptcy Code is quite clear—only traditional spendthrift trusts are to be excluded from the bankruptcy estate." (quoting *In re Wimmer*, 121 B.R. 539, 543 (Bankr.C.D.Ill.1990), *aff'd*, 129 B.R. 563 (C.D.Ill.1991))). To determine whether the Debtor holds a trust interest, then, the Court must look to the intent of the parties.

### D. Only the CREF Account Constitutes a Trust

The two contracts are largely similar. In consideration for premiums paid on behalf of the Debtor, she and (if she chooses) her spouse are entitled to receive "annuity" payments from the company in accordance with a pre-determined schedule. Exhibit A at ¶¶ 1, 6, 7 and 23; Exhibit B at ¶¶ 1, 6, 7 and 22. Should the Debtor die "prior to the Annuity Starting Date," each contract calls for the payment of a death benefit. *Id.* at ¶ 8; Exhibit A at ¶ 8.

The amount of the annuity is based on the amount paid in premiums, as well as the recipient's age and sex. *Id.* at ¶¶ 5 and 7; Exhibit B at ¶¶ 4, 5 and 7. In the case of CREF, the annuity amount is also tied to the value of the company's assets. *Id.* Thus CREF's annuity obligation is "variable," whereas TIAA's is "fixed"—a distinction which appears to hold true with

respect to most if not all annuity contracts offered by the companies. *See, e.g., Connick v. Teachers Ins. & Annuity Ass'n,* 784 F.2d 1018, 1019 (9th Cir.1986) ("TIAA ... provides a fixed retirement annuity for employees of institutions of higher education.... CREF ... provides a variable retirement annuity program for college and university employees.").

■ The *sine qua non* of a "trust" is the division of ownership rights in the subject property—the trust beneficiary holding "equitable" title thereto but the trustee holding "legal" title. *See, e.g., City of Farrell v. Sharon Steel Corp.,* 41 F.3d 92, 95 n. 2 (3d Cir.1994) ("The 'classic definition of a trust ... [is that] the beneficiary has an equitable interest 'in the trust property while legal title is vested in the trustee.'" (citation omitted)); *see also Leadbetter,* 1993 WL 141068 at *3 (quoted *supra* p. 425). The Court will therefore examine each of the contracts to determine whether, with respect to premiums paid, TIAA and CREF obtained legal but not equitable title.

### (i) Legal Title

■ The contracts do not require TIAA or CREF to establish a segregated account funded solely by premium payments made pursuant to the contracts. *Compare Baxter,* 135 B.R. at 355 (wherein TIAA and CREF stipulated that "accumulations associated with the TIAA Contract and the CREF Contract ... are commingled with the accumulations associated with the contracts of all other TIAA–CREF participants"); 1952 N.Y. Laws ch. 124, § 4 ("The corporation hereby formed[, i.e., CREF,] shall have power ... to acquire property ...; to hold and dispose of the same, and to invest, reinvest, accumulate, deal with, take action with respect to, and expend the property and income of said corporation in such manner as the [board of] trustees shall deem best, *without any obligation to segregate contributions, or the investment thereof,* of participating institutions or their teachers and other employees or both...." (emphasis added)). More to the point, neither contract specifies that legal ownership of such premiums is to vest in MSU (or the Debtor). *Cf. Baxter,* 135 B.R. at 355 (wherein TIAA/CREF stipulated that it "treat[ed] the accumulations associated with the TIAA Contract and the CREF Contract as assets of TIAA–CREF on TIAA–CREF's books"). Moreover, there is affirmative evidence indicating to the contrary. *See* Exhibit 4 at p. 12 ("CREF currently has eight different investment accounts. All assets of the accounts belong to CREF."); Exhibit 5 at p. 8 ("... TIAA owns the assets of the Real Estate Account...."). Accordingly, the Court concludes that TIAA and CREF acquired legal ownership of premiums paid to them on behalf of the Debtor.

### (ii) Equitable Title

The term "'[e]quitable title' may be defined as 'the *beneficial* interest of one person whom equity regards as the real owner, although the legal title is vested in another.'" *Arachnid, Inc. v. Merit Indus., Inc.,* 939 F.2d 1574, 1578 n. 3 (Fed. Cir.1991) (quoting Black's Law Dictionary (6th ed.1990)) (emphasis added). Whether such an interest was created in this case turns on the amount of discretion which, under the terms of their respective contracts with the Debtor, TIAA or CREF enjoyed with respect to the use of premiums paid to them. If such use was contractually unrestricted, then the Debtor held no "beneficial interest" therein. On the other hand, the Debtor would hold such an interest if TIAA or CREF was obliged by contract to apply the premiums to the Debtor's benefit. *See, e.g., In re*

*Morales Travel Agency,* 667 F.2d 1069, 1071 (1st Cir.1981) ("The terms of the ... Agreement ... were inadequate ... to give rise to a trust upon the proceeds from tickets sold by Morales to its customers.... The contract nowhere required Morales to keep the proceeds of Eastern's ticket sales separate from any other funds.... Nor was any specific restriction placed upon Morales' use of the supposed trust funds. Morales was left free to use what it received for its own benefit rather than Eastern's...."); *In re Lord's, Inc.,* 356 F.2d 456, 458 (7th Cir.1965) ("The question in each case is whether the settlor manifested an intention ... to impose upon himself or upon a transferee of the property equitable duties to deal with the property for the benefit of another person."); *King v. Richardson,* 136 F.2d 849, 857 (4th Cir.1943) ("A trust arises when property is given to one with direction that it be used and applied for the benefit of another."); *In re Penn Central Transp. Co.,* 328 F.Supp. 1278, 1279 (E.D.Pa.1971) ("The crucial factor in distinguishing between a trust relationship and an ordinary debt is whether or not the recipient of the funds was entitled to use the funds as its own...."); *Murry v. Hale,* 203 F.Supp. 583, 591 (E.D.Ark.1962) ("Generally, in the case of a ... trust the trustee does not receive the money for his own use and benefit, but holds it for the benefit of the cestui que trust, whether the cestui be the original transferor or a third person.").

■ Mindful of these basic principles, the Court first considers the CREF contract. It states that "[e]ach premium paid, less an expense charge in accordance with the Rules of the Fund, will be applied to purchase Accumulation Units." Exhibit B at ¶ 4.[7] "When annuity payments begin ..., all Accumulation Units then standing to [the Debtor's] ... credit are exchanged for a Unit-annuity." *Id.* at ¶ 5. The "Unit-annuity," the contract explains, "consists of a series of payments of the current dollar value of a specified, fixed, number of Annuity Units." *Id.* This "value will increase or decrease from time to time to reflect changes in CREF's investment, mortality and expense experience." *Id.*

■ As with TIAA, it appears that CREF commingles premium payments received from MSU with premiums paid on its other annuity contracts. But without more, the pooling of money from various sources into a single fund does not negate the existence of a trust. *See* RESTATEMENT (SECOND) OF TRUSTS § 227, Comment 'j' ("[T]he fact that in making investments trust funds of one trust are combined with funds of other trusts administered by the trustee does not make the investment improper, provided that it is in other respects proper." (*quoted in Manchester Band of Pomo Indians, Inc. v. United States,* 363 F.Supp. 1238, 1248 n. 3 (N.D.Cal.1973))); *cf. John Hancock Mut. Life Ins. Co. v. Harris Trust & Sav. Bank,* 510 U.S. 86, 101, 114 S.Ct. 517, 126 L.Ed.2d 524 (1993) ("[A] plan's deposits are not shielded from the reach of ERISA's fiduciary prescriptions solely by virtue of their placement in an insurer's general account...."). There is also reason to conclude that, notwithstanding the absence of a provision mandating that premiums be placed by CREF into a segregated account, the parties contemplated that the premiums would be held in trust.

One indication is the manner in which CREF annuities are computed, which suggests that the Debtor has a property interest in the company's investments. Consistent with this view, the contract provides that "additional Accumulation Units will be credited to the [Debtor] ... monthly by

---

7. A copy of the so-called "Rules of the Fund" was not submitted.

applying ... her share of the net dividend and other income of CREF to purchase additional Accumulation Units." Exhibit B at ¶ 4. The contract is styled as a "certificate," and what it "certifies" is that the Debtor "is entitled to share in the benefits of ... CREF." *Id.* at p. 1. *See also id.* ("Each premium purchases Accumulations Units representing your proportionate share in CREF."); *cf. In re Reynolds,* No. 87–15311, 1989 WL 252636, *1 (Bankr. W.D.Ark. Sept. 18, 1989) ("A general reading of the CREF certificate indicates that ... premiums are paid to purchase units of the fund.").

Of paramount importance, though, is the fact that the return on CREF's investments determines—if only in part—the value of the Debtor's annuity payments. *See* Exhibit B at p. 1 ("The amount of dollars payable [to the Debtor or her beneficiary] will fluctuate in accordance with the current value of an Annuity Unit, which will change primarily with changes in the value of the common stocks and other assets of CREF. No guarantee of dollar amounts is provided...."). What this means, in effect, is that CREF transferred the risks and potential benefits of its investments to the Debtor. *See, e.g., SEC v. Variable Annuity Life Ins. Co. of America,* 359 U.S. 65, 71, 79 S.Ct. 618, 3 L.Ed.2d 640 (1959) ("[A]bsent some guarantee of fixed income, the variable annuity places all the investment risks on the annuitant, none on the company."). And this transfer is a strong indication that the "transferee"—i.e., the Debtor—holds an equitable interest in CREF's portfolio. *See generally, e.g., Freede v. Commission-*

*er,* 864 F.2d 671, 676 (10th Cir.1988) ("Risk of loss often has been used as an indicia of an ownership interest."); *Hinkle Northwest, Inc. v. SEC,* 641 F.2d 1304, 1307 (9th Cir.1981) (describing "risk of profit or loss" as one of the "indicia of ownership"); *United States v. Ventura,* 17 F.Supp.2d 1204, 1211 (D.Kan.1998), *aff'd,* 172 F.3d 880 (10th Cir.1999) (unpublished) ("it is well established that risk of loss is one of the most critical factors in determining ownership."); K. Coleman, *Pre–Petition IRS Levies on "Cash Equivalents": Why They are Recoverable by the Estate Even Absent a Present Right to Collect,* 100 Com. L.J. 471, 494 (Winter, 1995) (collecting cases for the proposition that "[r]isk of loss is a classic indicator of equitable ownership"); *cf. American Bankers Ass'n v. SEC,* 804 F.2d 739, 751 (D.C.Cir.1986) ("[T]he holder of a variable annuity ... 'participates on an 'equity' basis in the investment experience of the enterprise,' just like the owner of a share of company stock or a mutual fund does." (citation omitted)); *Morter,* 110 B.R. at 395 ("[A] trust confers upon a beneficiary an indefinite and uncertain sum of money based upon actual income...." (quoting *In re Folsom's Will,* 155 N.Y.S.2d 140, 148 (N.Y.Sur.Ct.1956), *aff'd,* 6 A.D.2d 691, 174 N.Y.S.2d 116 (N.Y.App.Div.1958), *aff'd sub nom. In re Folsom's Estate,* 6 N.Y.2d 886, 190 N.Y.S.2d 381, 160 N.E.2d 857 (1959))).

As noted above, CREF was contractually obligated to use the premiums—less certain administrative charges—to purchase "accumulation units" on behalf of the Debtor. This meant, in effect, that the premiums would be invested by CREF.[8]

---

**8.** In creating CREF, the New York legislature certainly appears to have contemplated such arrangements. *See* 1952 N.Y. Laws ch. 124, § 2 ("The purpose of [CREF] ... is to aid and strengthen ... colleges, universities, and other institutions engaged primarily in education or research, by providing means for the diver-

sification of investment of contributions of such institutions and their teachers and other employees, [and] *by providing benefits based upon such contributions and the valuation and yield of the investment thereof....*" (emphasis added)).

*See* Exhibit B at p. 1, 190 N.Y.S.2d 381, 160 N.E.2d 857 ("... Accumulation Units represent[ ] your proportionate share in CREF."). And since the Debtor stood to gain or lose depending on the return from such investment, it is reasonable to infer that CREF undertook to make the investment at least partially for her benefit. *Cf.* 29 U.S.C. § 1101(b)(2) (Pursuant to this provision, the fiduciary standards generally imposed by ERISA on managers of "plan assets" are inapplicable to assets derived from the issuance of "guaranteed benefit" policies. *See John Hancock,* 510 U.S. at 95–97, 114 S.Ct. 517.).

Because there is an implicit contractual requirement that premium payments be applied to the Debtor's benefit, the Court concludes that the Debtor held equitable title in at least a portion of the premiums paid on her behalf to CREF. Her account with CREF is therefore a trust. *See Morter,* 110 B.R. at 395; *In re Hipple,* 225 B.R. 808, 815–17 (Bankr.N.D.Ga.1996); *In re Lyons,* 148 B.R. 88, 92–94 (Bankr. D.D.C.1992); *Richardson,* 123 B.R. at 542–44; *Reynolds,* 1989 WL 252636 at *4; *Montgomery,* 104 B.R. at 114–18; *In re Woodward,* No. 3–87–0036, 1988 WL 236354, at *2 (Bankr.W.D.Ky. Feb. 16, 1988), *aff'd,* No. 88–0161, 1988 WL 236353 (W.D.Ky. June 24, 1988); *In re Braden,* 69 B.R. 93, 94 (Bankr.E.D.Mich.1987).

 Regarding the TIAA contract, however, the Court reaches a different conclusion. The contract provides that "[e]ach premium purchases a *guaranteed* amount of [the Debtor's] ... life annuity and of the death benefit for [her] ... Beneficiary." Exhibit A at p. 1 (emphasis added). "[S]uch amount will be determined by the Rate Schedule in effect under th[e] contract at the time the premium is due." *Id. See also id.* at ¶ 5 ("The Accumulation is the total of all premiums paid, plus any amounts that may be credit-

ed to the contract at the discretion of TIAA ..., less the charges for expenses and contingencies set forth in the ... Rate Schedule....").

The "Rate Schedule" referenced in the TIAA contract was not made a part of the record. Since the contract does not indicate otherwise, however, the Court assumes that annuity/death benefit amounts are established without reference to the value of any investment portfolio. Thus there is no basis for inferring that TIAA was obligated to use any portion of premium payments it received solely for the Debtor's benefit. Indeed, TIAA implicitly (and successfully) disclaimed any such obligation in a case involving a creditor's attempt to execute on a money judgment against the annuitant:

> ... TIAA argue[d] persuasively that there [was no] ... property in the possession of TIAA in which [the judgment debtor] ... ha[d] a property interest.... TIAA contend[ed] further that the premiums paid by employer and judgment-debtor do not constitute property in which the judgment debtor has an interest.... [T]he judgment-debtor has no 'interest' in [the premiums].... The only interest he has is a contingent interest which will pay him a monthly amount if he is alive on the [annuity] starting date.... The annuitant has [no] ... right to reach the premiums paid for the purchase of annuities.

*Alexandre v. Chase Manhattan Bank,* 61 A.D.2d 537, 403 N.Y.S.2d 21, 23 (N.Y.App. Div.1978).

Similarly, in opposing a bankruptcy trustee's turnover demand, TIAA/CREF "assert[ed] that ... fund accumulations [under the debtor's contracts with TIAA and CREF] ... were not debtor's prior to the filing of her bankruptcy petition." *Baxter,* 135 B.R. at 356. The companies "ask[ed] the Court to ... determine that

... the debtor's only interest in the contracts [was] ... a limited inchoate right to receive monthly annuity payments at some point in the future upon the occurrence of certain contractual conditions precedent." *See also Richardson*, 123 B.R. at 544 (referring to TIAA/CREF's "argument that the [annuity] funds may not be turned over to the bankruptcy estate because they are assets of TIAA/CREF and not the debtor"). Therefore, while the TIAA contract refers to an "accumulation," the quoted term appears to be nothing more than a figure of speech—a shorthand expression of the running tally maintained by TIAA of credits and debits pertaining to the computation of the Debtor's annuity/death benefit.

■ Put simply, the Debtor's contract with TIAA neither explicitly nor implicitly restricts the latter's use of premium payments. Consequently, and in stark contrast to the CREF account, TIAA was under no contractual obligation to invest the payments in such a manner as to protect or benefit the Debtor's economic well-being. Since there is no identifiable "res" with respect to which the Debtor held an equitable ownership interest, the Court concludes that a trust was not established with TIAA. *See Morter*, 110 B.R. at 395 (holding that the TIAA contract did not create a trust, and noting that the contract provided for a "guaranteed ... fixed ... income [to the annuitant] ...", irrespective of the portfolio's later returns"); *see also, e.g., Hughes v. Sun Life Assur. Co. of*

*Canada*, 159 F.2d 110, 113 (7th Cir.1946) (rejecting the argument that a company which had issued a fixed annuity was a "trustee," reasoning that "the annuity contract created only the relationship of debtor and creditor"); *Chatham County Hosp. Auth. v. John Hancock Mut. Life Ins. Co.*, 325 F.Supp. 614, 619–20 (S.D.Ga.1971) ("Annuity agreements create only the relation of debtor and creditor, not a trust." [9]). In a case where a life insurance company was obliged to pay out the death benefits in 240 monthly installments, the court explained why the company was not a trustee.

> The obligation of the insurance company constitutes a debt from the company to ... the beneficiary.... Although the word "trust" is used, the agreement is not in fact a trust agreement. The monthly payments ... are definitely fixed in amount.... They constitute deferred payments which the company agreed to make to the beneficiary in consideration of the receipt at the death of [the] insured of $50,000, the face value of the policy.

*Crossman Co. v. Rauch*, 263 N.Y. 264, 273, 188 N.E. 748 (N.Y.1934). *See also Walro v. Striegel*, 131 B.R. 697, 701 (S.D.Ind. 1991) (fixed annuity held not to constitute a trust for § 541(c)(2) purposes); *In re Brown*, 86 B.R. 944, 948 (N.D.Ind.1988) (same); *In re Riley*, 91 B.R. 389, 390–91 (Bankr.E.D.Va.1988) (exemption of debtor's interest in a fixed annuity disallowed on grounds that the annuity was not a trust). Although there are cases to the

---

9. As today's opinion would suggest, the Court is of the view that *Chatham County's* pronouncement is overly broad: It would be more accurate to state that a *fixed*-annuity contract establishes only a debtor-creditor relationship. *See generally, e.g., NationsBank of North Carolina v. Variable Annuity Life Ins. Co.*, 513 U.S. 251, 264, 115 S.Ct. 810, 130 L.Ed.2d 740 (1995) (While fixed annuities "have significant investment features," they

"more closely resemble insurance than do variable annuities, ... and are functionally similar to debt instruments."); *American Bankers Ass'n v. SEC*, 804 F.2d 739, 751 (D.C.Cir.1986) (indicating that the purchaser of a fixed annuity, unlike a variable annuity, does not " 'participate[ ] on an 'equity' basis in the investment experience of the enterprise' " (citation omitted)).

contrary, these cases did not examine the question of whether the annuity obligor's use of premium payments was contractually restricted.[10]

### E. The CREF Account is Excluded From the Estate

The CREF contract purports to preclude any transfer of the Debtor's interest therein. Thus the next question to be addressed is whether this "restriction ... is enforceable under" New York law. 11 U.S.C. § 541(c)(2).

When confronted with this question, bankruptcy courts have typically focused on the extent to which the trust beneficiary can control disposition of the funds held in trust: The greater the debtor's "access" to such funds, the less likely the anti-transfer provision will be upheld. *See, e.g., In re Perkins,* 902 F.2d 1254, 1257 n. 2 (7th Cir.1990) (In deciding whether a spendthrift trust is valid under Illinois law, "[t]he degree of control which a beneficiary exercises over the trust corpus is the principal consideration."); *In re Benton,* 237 B.R. 353, 360 (Bankr.E.D.Mich.1999) (" 'The primary consideration in determining whether a valid spendthrift trust exists is the beneficiary's degree of control over the trust.' RESTATEMENT (SECOND) OF TRUSTS § 153(2) (1959)." (applying Michigan law)); *In re Bottom,* 176 B.R. 950, 952 (Bankr.N.D.Fla.1994) ("Clearly 'a spendthrift trust cannot exist [under Florida law] if the beneficiary is able to control the assets of the trust before its maturation.' " (citation omitted)); *In re Hannegan,* 155 B.R. 209, 214 (Bankr.E.D.Mo.1993) ("Missouri courts will not recognize a spend-

thrift trust when the beneficiary of the trust has 'dominion or control over the trust.' " (citation omitted)).

The trustee adverts to this "access theory" in challenging the Debtor's contention that the CREF account is excluded from the bankruptcy estate. Citing Plan provisions permitting loans and "hardship withdrawals," the trustee asserts that the Plan cannot properly be regarded as "a valid spendthrift trust." Trustee's Brief at p. 8. *See also id.* at p. 5 ("If the debtor is allowed to have access to her funds though loans or due to financial hardship, then the debtor's creditors should also be entitled to those funds.").

There are cases decided under New York law which support the proposition that the kind of access which the Debtor enjoys with respect to the CREF account would render an antialienation provision invalid for § 541(c)(2) purposes. In particular, courts have "struck down" such provisions insofar as they pertained to an Individual Retirement Account ("IRA"), based on the fact that the debtor had the right to withdraw funds from the account at any time (and even though the withdrawal could trigger adverse tax consequences under 26 U.S.C. § 72(t)). *See In re Taft,* 171 B.R. 497, 503 (Bankr.E.D.N.Y. 1994) (Holland, J.) (holding that a simplified employee pension, which is a kind of IRA, *see* 26 U.S.C. § 408(k), was not a valid spendthrift trust, and making note of the debtor's ability to obtain "withdrawals from the [Pension] ... for any reason, subject merely only [sic] to a minimal tax penalty"), *aff'd in pertinent part and rev'd*

---

10. *See Morter,* 937 F.2d at 358–59; *In re Schuster,* 256 B.R. 701, 703 (Bankr.D.N.J. 2000); *Hipple,* 225 B.R. at 815–17; *In re Fink,* 153 B.R. 883, 885 (Bankr.D.Neb.1993); *Lyons,* 148 B.R. at 92–94; *In re Kelvington,* 146 B.R. 358, 360 (Bankr.W.D.Pa.1992); *Richardson,* 123 B.R. at 542–44; *Montgomery,* 104 B.R. at 114–18; *Woodward,* 1988 WL 236354 at *2; *Braden,* 69 B.R. at 94. In *Morter,* the Seventh Circuit also failed to address the tension between its holding and the same court's decision in *Hughes, supra* p. 436.

*in part on other grounds*, 184 B.R. 189 (E.D.N.Y.1995); *In re Slepian*, 170 B.R. 712, 714 (Bankr.S.D.Ala.1994) (also citing the fact that the debtor was permitted to use his IRA as collateral for a loan to support the court's conclusion that he "ha[d] control over the corpus of his IRA"); *In re Kramer*, 128 B.R. 707, 709 (Bankr.E.D.N.Y.) (Duberstein, J.); *cf. In re Iacono*, 120 B.R. 691, 695 (Bankr. E.D.N.Y.1990) (Eisenberg, J.) ("[A]n IRA cannot be exempt under section 5205(c) because it is ... clearly not a spendthrift trust due to its very nature as a self settled device established and controlled by the individual."). One court reached essentially the same conclusion with regard to a CREF account, reasoning that "[t]he debtor ... ha[d] effective control over the distribution or termination of the trust in that he may reach the funds of the trust and may surrender the annuities for cash." *Richardson*, 123 B.R. at 543.

The IRA cases cited, however, did not implicate 1952 N.Y. Laws ch. 124, § 9, the New York statute specifically governing CREF benefits. And while *Richardson* should have addressed this statute, it did not. Thus in the Court's view, the cases are either not on point or, with respect to *Richardson*, unpersuasive.

Section 9 prohibits the transfer of any "money or other benefit provided or rendered by" CREF. *See supra* p. 419 (more fully quoting the statute). If this statutory prohibition applies to the case at hand, then it logically follows that the antialienation provisions of the CREF contract are "enforceable" for § 541(c)(2) purposes. Indeed, it could be argued that under such circumstances the Debtor's trust interest would be excluded even if the CREF contract contained no restriction on alienation. *See, e.g., Yuhas*, 104 F.3d at 616 n. 3 ("[W]e reject the argument that a restriction contained in a statute cannot qualify

as a 'restriction on ... transfer ...' within the meaning of § 541(c)(2)."). *But see, e.g., In re Zott*, 225 B.R. 160, 166 (Bankr. E.D.Mich.1998) (Section 541(c)(2) pertains only to a transfer restriction which is "contained in the trust document."). The question here, then, is whether New York courts would recognize an exception to § 9 when the CREF participant has the kind of loan and/or withdrawal rights accorded to the Debtor.

Section 9 itself suggests no exceptions of any kind. Its prohibitory language is absolute and categorical. As with just about any statute, of course, there may be situations in which application of § 9 would contravene some other important legislative policy. In such a situation, a "nuanced" reading of § 9 is arguably in order. *See generally United States v. Rutherford*, 442 U.S. 544, 555, 99 S.Ct. 2470, 61 L.Ed.2d 68 (1979) ("Only when a literal construction of a statute yields results so manifestly unreasonable that they could not fairly be attributed to congressional design will an exception to statutory language be judicially implied.").

A case illustrating this point is *Tompkins County Trust Co. v. Gowin*, 163 Misc.2d 418, 621 N.Y.S.2d 476 (N.Y.Sup. Ct.1994). The plaintiff in *Gowin* sought to enforce a money judgment against the judgment debtor's CREF account. *Id.* at 478. CREF argued that the plaintiff was precluded from doing so by virtue of § 9. *Id.* The court noted, however, that the judgment debtor had transferred $100,000 into the CREF account "without consideration" and only "[t]hree days prior to [the] trial" from which the judgment had emanated. *Id.* This transfer, the court ruled, "was fraudulent under New York law (Debtor & Creditor Law, sections 273, 273-a, 274)." *Id.* The court further noted that for this reason, and because the transfer occurred "within 90 days before the

commencement of the action upon which the judgment ... entered," the judgment debtor could not use "CPLR 5205[to] exempt[ the transferred funds] ... from the normal remedies available to creditors seeking to enforce money judgments." *Id.* Accordingly, the court held that the money fraudulently transferred into the CREF account was not protected by § 9. *Id.* at 479.

*Gowin* stands for the proposition that § 9 is premised on the assumption that the CREF benefits in question are derived from "legitimate" contributions—i.e., contributions which are not subject to invalidation pursuant to some other statutory provision. This ruling is certainly defensible, harmonizing as it does § 9 with New York statutes relating to fraudulent transfers. And as *Gowin* indicates, there is reason to believe that the New York Court of Appeals would adopt the same reasoning. *See Planned Consumer Mktg. v. Coats & Clark, Inc.,* 71 N.Y.2d 442, 454–55, 527 N.Y.S.2d 185, 522 N.E.2d 30 (N.Y. 1988) (holding that money fraudulently transferred into a profit-sharing plan was subject to a turnover order, notwithstanding the plan's ERISA-mandated antialienation provision); *Gowin,* 621 N.Y.S.2d at 479 (positing that the Court of Appeals would continue to "follow the ... *Consumer Marketing* ... logic, as applied to the ERISA anti-alienation clause, in respect to the nearly identical anti-alienation provisions of ... section 9"); *see generally In re Akron–Cleveland Auto Rental, Inc.,* 921 F.2d 659, 662 (6th Cir.1990) ("[O]n issues of state law," the decision of an intermediate state court "will normally [be] treat[ed] ... as authoritative ... absent a strong showing that the state's highest court would decide the issue differently.").

But while § 9 may be subject to exceptions, it also seems fair to say that those exceptions are few and far between. *Consumer Marketing* itself suggests as much:

> In *Helmsley–Spear[, Inc. v. Winter,* 74 A.D.2d 195, 426 N.Y.S.2d 778 (N.Y.App. Div.1980), *aff'd,* 52 N.Y.2d 984, 438 N.Y.S.2d 79, 419 N.E.2d 1078 (1981)], the employer sought to attach the assets, including those in an ERISA fund, of an employee convicted of having stolen checks from his employer. The Appellate Division held, *and we agreed,* that under those circumstances, vested benefits from an ERISA trust are exempt from attachment by creditors.... Similarly, in *Ellis[ Nat'l Bank v. Irving Trust Co.,* 786 F.2d 466 (2d Cir.1986)] ..., the Second Circuit held that the antialienation provision of ERISA prohibits an employer from reclaiming certain funds contributed to an ERISA trust even though those funds represent moneys ultimately derived from fraudulent practices against the employer for which the employee was convicted. Both cases involved an employer's attempt to reach assets of an employee in satisfaction of a judgment based on wrongdoing wholly unrelated to the creation and disposition of funds into an ERISA account. The fraud occurred separately from and independently of the employee's ERISA interests, and there was no attempt to abuse the Federal shield of ERISA assets in order to violate State fraud laws.
>
> Here, however, the very creation and enhancement of the trust is alleged to have been in defraud [sic] of creditors.

*Consumer Marketing,* 71 N.Y.2d at 454, 527 N.Y.S.2d 185, 522 N.E.2d 30 (emphasis added).

Thus it would appear that the ERISA antialienation provision—and, by logical extension, § 9—is to be broadly construed by New York courts: Even in cases of outright theft, the protection from alien-

ation remains intact. *Compare Guidry*, 493 U.S. at 376, 110 S.Ct. 680 (holding that ERISA's antialienation statute precluded imposition of a constructive trust on pension benefits owed to an individual convicted of embezzlement). Alienation is permitted, *Consumer Marketing* suggests, only when the deposit of funds into the protected account is itself unlawful.

Measured against the foregoing standard, it is clear that the facts in this case come up short. The trustee is not alleging that the Debtor's conduct was wrongful in any respect, much less that the premium payments to CREF (or TIAA) were improper. Rather, the trustee's argument—which ignores § 9, even though that statute is quoted in the CREF contract—is focused solely on the degree of access the Debtor enjoys vis-à-vis the CREF account.

Understandably, New York courts tend to look with disfavor on the notion that a creditor can be denied recourse to non-exempt assets controlled by the debtor. *See* cases cited *supra* p. 437–38; *see also Portnoy*, 201 B.R. at 700 ("[I]t would offend [New York] ... policies to permit a debtor to shield from creditors all of his assets because ownership is technically held in a self-settled trust, where the settlor/beneficiary nonetheless retains control over the assets and may effectively direct disposition of those assets."). But it must be remembered that § 9 reflects a *legislative* policy—namely, that CREF benefits are of such fundamental importance to the public interest that they are off-limits to creditors. In *Guidry*, the Court stressed the importance of judicial respect for the value judgment implicit in a statute of this sort:

> [W]e [do not] think it appropriate to approve any generalized equitable exception—either for employee malfeasance or for criminal misconduct—to

ERISA's prohibition on the assignment or alienation of pension benefits.

. . .

As a general matter, courts should be loath to announce equitable exceptions to legislative requirements or prohibitions that are unqualified by the statutory text. The creation of such exceptions, in our view, would be especially problematic in the context of an antigarnishment provision. Such a provision acts, by definition, to hinder the collection of a lawful debt. A restriction on garnishment therefore can be defended *only* on the view that the effectuation of certain broad social policies sometimes takes precedence over the desire to do equity between particular parties. It makes little sense to adopt such a policy and then to refuse enforcement whenever enforcement appears inequitable. A court attempting to carve out an exception that would not swallow the rule would be forced to determine whether application of the rule in particular circumstances would be "especially" inequitable. The impracticability of defining such a standard reinforces our conclusion that the identification of any exception should be left to Congress.

*Guidry*, 493 U.S. at 376–77, 110 S.Ct. 680. *See also Shumate*, 504 U.S. at 764–65, 112 S.Ct. 2242 (reaffirming *Guidry's* pronouncement that exceptions to ERISA's antialienation provision are to be created by Congress, rather than the courts); *United Metal Prods. Corp. v. National Bank of Detroit*, 811 F.2d 297, 300 (6th Cir.1987) (a *pre-Guidry* ERISA case in which the Sixth Circuit noted "the simple fact ... that, as a policy matter, whether ... [a statutory] exception should be created is a question for legislative rather than judicial judgment").

Thus if § 9 is to be construed as subject to any unwritten exceptions, that construc-

tion cannot be based on common-law principles of equity. As in *Gowin* and *Consumer Marketing*, there must instead be evidence that the legislature itself did not intend the statute to be applied to the facts at hand.

In this regard, the Court is aware of no statute or legislative history suggesting that § 9's applicability turns on the level of control or access that the CREF participant enjoys. In fact, evidence to the contrary is provided by a New York statute identifying exempt property interests. Section 5205 of the Civil Practice Law and Rules provides in pertinent part:

(c) Trust exemption. 1 ... [A]ll property while held in trust for a judgment debtor, where the trust has been created by, or the fund so held in trust has proceeded from, a person other than the judgment debtor, is exempt from application to the satisfaction of a money judgment.

2. For purposes of this subdivision, all trusts, custodial accounts, annuities, insurance contracts, monies, assets or interests established as part of, and all payments from, either any trust or plan, which is qualified as an individual retirement account under [26 U.S.C. § 408 or 408A] ..., or a Keogh ..., retirement or other plan established by a corporation, which is qualified under ... [26 U.S.C. §] 401 ..., shall be considered a trust which has been created by or which has proceeded from a person other than the judgment debtor....

3. All trusts, custodial accounts, annuities, insurance contracts, monies, assets, or interests described in paragraph two of this subdivision shall be conclusively presumed to be spendthrift trusts under this section and the common law of the state of New York for all purposes, including, but not limited to, all cases aris-

ing under or related to a case arising under ... the ... Bankruptcy Code.... N.Y. C.P.L.R. § 5205(c). *See also* N.Y. E.P.T.L. § 7–3.1 (This statute is essentially a negative restatement of § 5205(c), setting forth the general rule that a self-settled trust "is void as against the existing or subsequent creditors of the creator." N.Y. E.P.T.L. § 7–3.1(a). Subparagraphs (b)(1) and (b)(2) of § 7–3.1 are substantially identical to, respectively, subparagraphs (2) and (3) of § 5205(c).).

As can be seen, § 5205(c) provides that a wide range of retirement plans are "conclusively presumed to be spendthrift trusts" for Bankruptcy Code purposes. Since the statute does not indicate otherwise, it is reasonable to infer that a debtor does not lose the benefit of this presumption simply because, for example, she has an immediate right to withdraw funds from the plan.

Several considerations reinforce this interpretation. First, the statute is obviously tailored to prevent certain kinds of abuse. *See* N.Y. C.P.L.R. § 5205(c)(5) ("Additions to an asset described in [§ 5205(c)(2)] ... shall not be exempt from application to the satisfaction of a money judgment if (i) made after the date that is ninety days before the interposition of the claim on which such judgment was entered, or (ii) deemed to be fraudulent conveyances under article ten of the debtor and creditor law."); *see also* N.Y. C.P.L.R. § 5205(c)(4) (Section 5205(c) "shall not impair any rights an individual has under a qualified domestic relations order ... or under any order of support, alimony or maintenance...."). Thus it would be particularly inappropriate to expand the universe of exceptions to § 5205(c)(1) based on a perceived form of abuse that, in the court's view, the legislature "overlooked." *See Mackey v. Lanier Collection Agency & Serv., Inc.*, 486 U.S.

825, 836–37, 108 S.Ct. 2182, 100 L.Ed.2d 836 (1988) (rejecting the argument that ERISA barred the garnishment under state law of welfare-plan benefits, and noting that "[w]here Congress intended in ERISA to preclude a particular method of state-law enforcement of judgments, or extend anti-alienation protection to a particular type of ERISA plan, it did so expressly in the statute"); *Iselin v. United States*, 270 U.S. 245, 251, 46 S.Ct. 248, 70 L.Ed. 566 (1926) ("What the government asks is not a construction of a statute, but, in effect, an enlargement of it by the court, so that what was omitted, presumably by inadvertence, may be included within its scope. To supply omissions transcends the judicial function.").

Another consideration relates to a 1989 amendment enlarging the scope of § 5205(c)(2). The corresponding legislative history indicates that the amendment was designed "[t]o counter the increasing [sic] callous manner with which bankruptcy courts are including qualified plan interests as assets available to bankruptcy creditors and to ... remove any opportunity for an aggressive bankruptcy judge to create artificial distinctions in order to include qualified retirement plan interests in a bankruptcy estate." *In re Modansky*, 159 B.R. 139, 142–43 (Bankr.S.D.N.Y.1993) (quoting 1989 New York Legislative Annual, at 158–59). One would certainly be hard-pressed to reconcile this "anti-inclusion" sentiment with the proposition that the legislature intended § 5205(c)'s protection to cover only retirement plans to which the debtor has no immediate access rights.

Finally, it bears noting that the Internal Revenue Code—to which § 5205(c) defers—clearly contemplates that plan participants will enjoy "early" withdrawal and loan rights. *See* 26 U.S.C. § 72(t) (Pursuant to this statute, the tax on distributions from a retirement plan is generally increased by 10% unless the employee is at least 59½ years of age.); 26 U.S.C. § 401(a)(13)(A) (So long as certain conditions are met, "a loan made to a [trust] participant or beneficiary" is deemed not to be "an assignment or alienation" of trust benefits, and therefore does not preclude the trust from obtaining or maintaining "qualified" status.); 26 U.S.C. § 72(p) (A "loan from a qualified employer plan" is not to be treated "as a distribution under such plan" if the criteria set forth in the statute are satisfied.). It, therefore, is especially unlikely that the New York legislature, without expressly saying so, intended plans with such features to be outside the reach of § 5205(c)(1).

There is good reason to question the proposition that § 5205(c)'s "conclusive presumption" controls the issue of whether an express "trust" exists within the meaning of § 541(c)(2). *See Wimmer*, 129 B.R. at 567 (For purposes of § 541(c)(2), the "Illinois [legislature] cannot define a spendthrift trust any way it pleases."); *In re Templeton*, 146 B.R. 757, 763 (Bankr. N.D.Ill.1992) ("declining to give effect to an Illinois statute similar to § 5205(c), and opining that the Illinois legislature may not employ the sophistry of a conclusive presumption to" transform an IRA into "a traditional spendthrift trust"); *VanMeter*, 137 B.R. at 912; *Kazi*, 125 B.R. at 986 (holding the Illinois statute at issue in *Templeton* "invalid under the Supremacy Clause"); *Wimmer*, 121 B.R. at 543 (same, and criticizing the statute as representing an attempt by "Illinois ... to make, by means of a conclusive presumption, a goose into a duck, despite the fact that it does not walk, sound or look much like a duck"); *In re Kleist*, 114 B.R. 366, 369–70 (Bankr.N.D.N.Y.1990) (referring to the "rather broad language" of § 5205 and characterizing the statute as an example of " 'bootstrapping,' that is, statutorily plac-

ing certain property under the control of the debtor within the protection ordinarily provided only to trusts possessing traditional spendthrift qualities"); *see also In re Heilman*, 241 B.R. 137, 162 (Bankr. D.Md.1999) (quoted *supra* p. 430, n. 6); *cf. In re Marchiando*, 13 F.3d 1111, 1116–17 (7th Cir.1994) (holding that for purposes of § 523(a)(4), no "fiduciary" relationship existed between a lottery-ticket vendor and the state, notwithstanding a state statute declaring that proceeds from the sale of such tickets were held in trust). *But see In re Block*, 121 B.R. 810, 813 (Bankr. C.D.Ill.1990) (upholding the validity of the same statute at issue in *Templeton, Wimmer*, and *Kazi*); *In re Balay*, 113 B.R. 429, 442–43 (Bankr.N.D.Ill.1990) (doing likewise, reasoning that "the State of Illinois has the power to determine what constitutes a spendthrift trust"); *Kleist*, 114 B.R. at 370 ("... Congress has declared, through Code § 541(c)(2), that deference will be accorded to the respective state created boundaries defining spendthrift trusts. New York has exercised its prerogative [via enactment of § 5205]...."); *see also supra* p. 430, n. 6 (citing cases which held that a statutory trust is an express trust). That issue is not before the Court, as the Debtor did not contend that § 5205(c)(2) encompasses the CREF

contract. The statute is nevertheless significant here, as it counsels against a narrow construction of § 9: If, after all, New York's legislature extended unqualified protection to the retirement plans described in § 5205(c), then it makes little sense for a court to "infer" that the protection afforded by § 9 is less comprehensive.

▉ With the exception noted earlier, *see supra* p. 37, § 9 has been enforced by the courts in strict conformity with its terms. *See Montgomery*, 104 B.R. at 116–18; *Woodward*, 1988 WL 236353 at *2–*5; *Reynolds*, 1989 WL 252636 at *3–*4; *Alexandre*, 403 N.Y.S.2d at 23–24; *Aurora G. v. Harold Aaron G.*, 98 Misc.2d 695, 414 N.Y.S.2d 632, 635 (N.Y.Fam.Ct.1979). There is no compelling reason to hold otherwise in this case. The Court, therefore, concludes that, notwithstanding the Debtor's withdrawal and loan rights, § 9 prohibits the transfer of her interest in the CREF contract. Accordingly, the antialienation provisions contained in that contract are enforceable, and the asset is excluded from the estate pursuant to § 541(c)(2).

Because § 541(c)(2) is not applicable to the TIAA contract, a hearing will be set on the trustee's objection to the Debtor's exemption of that asset.[11] The hearing will

---

11. The Court notes that it has had no input on the issue from TIAA. If and to the extent that the trustee's objection to the Debtor's exemption is sustained, however, the trustee will need to initiate a turnover action in this Court against TIAA if the company does not comply with her turnover demand. *See* 11 U.S.C. § 542(a); F.R.Bankr.P. 7001(1); *see also, e.g., In re Baxter*, 135 B.R. 353, 356 (Bankr. E.D.Ark.1992) (complaint filed by trustee against TIAA and CREF "seek[ing] turnover of funds accumulated in [the debtor's] ... retirement annuity contracts"). The company would then have the opportunity to argue that it has standing to contest the Court's § 541(c)(2) ruling—based, for example, on the ground that it could subject TIAA to negative tax consequences. *Cf. Shumate*, 504 U.S. at

760 n. 3, 112 S.Ct. 2242 (observing that the IRS has "espoused the view that the transfer of a beneficiary's interest in a pension plan to a bankruptcy trustee would disqualify the plan from taking advantage of the preferential tax treatment available under ERISA"); *In re Lucas*, 924 F.2d 597, 603 (6th Cir.1991) (A "favorable result" of the court's holding that § 541(c)(2) applied to the debtor's interest in an ERISA-qualified employee benefit plan is that "it prevents a plan from being subject to disqualification and loss of tax-exempt status when a bankruptcy trustee seeks turnover of a single debtor's interest in a plan."). If TIAA has standing, the Court will of course revisit the § 541(c)(2) issue in light of whatever evidence or arguments the company submits.

focus on the question of whether payments to the Debtor under the TIAA contract are "reasonably necessary for [her] ... support." 11 U.S.C. § 522(d)(10)(E).

An appropriate order has entered.

### SUBSEQUENT OPINION REGARDING OBJECTION TO EXEMPTION IN DEBTOR'S TIAA ACCOUNT

June 6, 2001

An evidentiary hearing on the issue of whether and to what extent the TIAA annuity is "reasonably necessary for the support of the debtor" was conducted today. 11 U.S.C. § 522(d)(10)(E).

■ In summary, the Debtor testified that because of chronic medical problems, she intends to retire at the age of 62, in approximately four years. She produced evidence which showed what her monthly income would be four years hence, including the following sources: TIAA annuity, CREF annuity, social security. She also produced a projection of what her anticipated expenses will be at the time of her retirement. Her projected monthly expenses equal or exceed her projected monthly net income, assuming the availability of the entire TIAA annuity. Therefore, all of that annuity is reasonably necessary for her support.

Because the trustee failed to carry her burden that all of the funds in the TIAA annuity were not reasonably necessary for the Debtor's support, the Court will enter an order overruling the trustee's objection to the allowance of the Debtor's exemption of this asset.